# UNITED DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| ROSALIE MENDOZA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 4:06CV00475 SNL (AGF) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Rosalie Mendoza's application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

Plaintiff, who was born on August 12, 1966, applied for benefits on May 1, 2004, claiming a disability onset date of November 1, 2003, due to a torn rotator cuff and rheumatoid arthritis in her fingers and arms, moving up to her shoulders. After her application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on July 7, 2005, at which Plaintiff was represented by counsel. On September 22, 2005, the ALJ issued a

decision that Plaintiff was not disabled as defined by the Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on January 26, 2006. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ improperly discounted the opinion of Plaintiff's treating physician and assessed a residual functional capacity (RFC") that was not based upon any medical evidence. Plaintiff seeks reversal of the ALJ's decision, or remand for further consideration.

## BACKGROUND

**Earnings Record and Application Forms**

Plaintiff's earnings record shows minimal earnings in 1983 through 1987 (with no earnings in 1985) and in 1994 through 1996, and no earnings thereafter. Tr. at 72. On her application forms, Plaintiff indicated that she cooked for and dressed her three children, ages 12, 4, and 2; and went grocery shopping twice a week for one hour, driving herself the five miles to the store. She also indicated that she was able to make simple meals like hotdogs, and do laundry and dishes, but that she could not open jars, make beds, iron, vacuum, take out trash, or garden. She asserted that sometimes her pain and stiffness kept her awake, that she had difficulty brushing her hair, closing buttons, and using zippers. Tr. at 100-02. On the "Pain Questionnaire" part of her application, Plaintiff wrote that every four to five days, she experienced pain from her shoulders to

her fingertips and sometimes in her hip, and that due to the pain, she could not reach above her head, use her hands, or sit for too long. She would use Darvoset or Tylenol to relieve her pain, but they were not very helpful. Tr. at 104.

On the agency form completed on August 23, 2004, in connection with her request for a hearing before an ALJ, Plaintiff wrote that she could no longer do heavy housework, that her mother helped her twice a week, and that she (Plaintiff) was going to physical therapy three times a week. Tr. at 85.

**Medical Record**

Some of the medical records before the Court predate Plaintiff's application for SSI;[1] however, these reports provide instructive background information. The earliest medical documents in the record are progress notes dated January 5, 2001, from a follow-up to an initial visit with Jodi Triggs, M.D. These notes state that Plaintiff reported that within two days of starting Prednisone (an anti-inflammatory coticosteroid), she noticed a significant improvement of her symptoms. Dr. Triggs assessed Polymyalgia rheumatica ("PMR"), and anemia, probably due to iron deficiency. Plaintiff was continued on Prednisone and told to return for follow-up in three months. Tr. at 125. A blood test indicated the presence of rheumatoid factor. Tr. at 152. At Plaintiff's follow-up visit on April 5, 2001, Dr. Triggs noted that overall, Plaintiff was doing "quite well" and that her pain had significantly decreased. Plaintiff's blood pressure was 126/80, and she had

---

[1] SSI benefits are not retroactive prior to the month in which the application is filed. 20 C.F.R. § 416.335.

normal range of motion of her wrists, fingers, and hands. She was started on Celebrex, and her Prednisone was ordered discontinued gradually over a four week period. Tr. at 126. A blood test indicated the presence of rheumatoid factor. Tr. at 158. On June 5, 2001, Plaintiff tested positive for pregnancy. Darvocet was discontinued, but Plaquenil[2] was continued. Tr. at 127.

The next medical notes in the record are dated April 1, 2002, when Plaintiff presented to Dr. Triggs complaining of increased pain in her hands and wrists, which was keeping her up night. It was noted that Plaintiff had been on Plaquenil and Celebrex for two months without significant relief. Dr. Triggs prescribed a Prednisone "boost" in addition to continued use of Plaquenil and Celebrex. Tr. at 128. On September 3, 2002, Plaintiff complained to Dr. Triggs of increased pain in her hands, wrists, and shoulders, which was worse in the morning, and also increased swelling and stiffness. Dr. Triggs discontinued Plaquenil, placed Plaintiff back on Prednisone, ordered x-rays of Plaintiff's hands, wrists, and shoulders, and made an appointment for Plaintiff for March 19, 2003, with a rheumatologist. Tr. at 130. Progress notes dated November 18, 2002, indicated that Plaintiff's shoulders were "better," but that her hands were still very sore. Plaintiff was referred to occupational therapy. Tr. at 132.

---

[2] Plaquenil is a brand name for hydroxychloroquine, an antimalarial medication. It is useful in treating rheumatoid arthritis, although its mechanism of action in this illness is not understood. http://www.medicinenet.com/hydroxychloroquine/article.htm

On January 31, 2003, Plaintiff was reportedly feeling "better," with no active joint pain or swelling, having had her Methotrexate ("MTX") increased. Tr. at 210. In progress notes dated May 28, 2003, Dr. Triggs noted that Plaintiff had never seen a rheumotologist and that MTX had helped her symptoms. Tr. at 208. Dr. Triggs wrote on November 24, 2003, that Plaintiff complained of stiffness and pain "lately," which was worse in her right wrist and caused difficulty in opening doors and jars. Plaintiff's rheumatoid arthritis was noted as "not controlled," and her dose of MTX was increased. Tr. at 206.

On April 6, 2004, Dr. Triggs reported that an increase in Plaintiff's MTX in December 2003 had helped "some," but that Plaintiff currently complained of increased stiffness and pain again in her hands, wrists, and shoulders. Arava was added to Plaintiff's medications and she was advised to return in two weeks. Tr. at 204. Dr. Triggs's progress notes dated April 20, 2004, stated that Plaintiff's symptoms were controlled with Prednisone currently, and that she was to continue on Prednisone until she returned to normal, and then start on a different (unspecified) anti-rheumatoid. Tr. at 202.

On June 24, 2004, consulting physician John Demorlis, M.D., examined Plaintiff in connection with her application for SSI benefits. He noted that Plaintiff had been diagnosed with rheumatoid arthritis four years earlier and was being treated, not by a rheumatologist but by her family physician, who "seems to be doing quite well." Dr. Demorlis noted that Plaintiff complained of pain and cramps especially in the hands,

5

wrists, shoulders, and neck. Plaintiff claimed that her daily pain level was an eight, and that at times she had problems buttoning things or using zippers, but she admitted that she could write "alright." She reported that she could walk about one block and stand for about one-half hour before her hips would begin to hurt and her feet swell. She denied any trouble sitting or riding in a car, and stated that she could lift 20 pounds. Plaintiff's current medications included Celebrex, Prednisone (10 mg once daily), and Imuran.[3] Physical examination revealed "an obese lady who moves about easily." Her blood pressure was 122/78. All range of motion values, including the shoulders, were recorded as normal. Dr. Demorlis's impressions were rheumatoid arthritis which "seem[ed] to be quiescent," iron deficiency anemia, and morbid obesity. Tr. at 194-200.

Dr. Triggs reported on July 12, 2004, that Plaintiff's joint pain was better but that Plaintiff still had a lot of stiffness in the morning. Dr. Triggs noted "severe" rheumatoid arthritis, discontinued Imuran, which Plaintiff was not tolerating well, and prescribed Arava, an anti-rheumatic drug. Tr. at 134.[4] According to progress notes dated July 28, 2004, Plaintiff had been seen in the emergency room the prior evening for neck and left shoulder pain, for which she was given an injection which helped her. The notes state

---

[3] Imuran is an immunosuppressant. Although its exact mechanism of action in rheumatoid arthritis is not known, its effect in suppressing the immune system appears to decrease the activity of this illness. www.medicinenet.com/azathioprine/article.htm

[4] On July 1, 2004, Kristen Morrow, completed a physical RFC assessment based upon her review of the file. Tr. at 90-97. Ms. Morrow signed the assessment as a "Medical Consultant," but the record suggests that she was a non-medical "counselor" with the state disability agency. Tr. at 201. In any event, the ALJ did not mention this assessment.

that Plaintiff was feeling "good" on the Arava, that she was not then on steroids, and that her joints other than the left shoulder were much better. Tr. at 136. An x-ray of the left shoulder showed no acute fracture or dislocation. Tr. at 121. An MRI dated August 10, 2004, revealed minimal joint arthritis, a small tendon tear, and left shoulder impingement. Tr. at 119. On August 19, 2004, Plaintiff was seen for an orthopedic consultation. She was given a cortisone/steroid injection. It was noted that she had an appointment with a physical therapist but had not yet begun therapy; it was considered extremely important for her to begin as soon as possible to get the shoulder moving. Tr. at 118. At a follow-up visit on September 20, 2004, Plaintiff reported that her shoulder pain was gone but that she still had significant limitation in range of motion. A more severe pathology than indicated on the MRI was postulated and Plaintiff was referred to orthopedic surgeon Steven Weissfeld, M.D. Tr. at 117. Plaintiff saw Dr. Weissfeld on October 12, 2004, reporting that the limited range of motion and weakness of her left shoulder was causing difficulty with some of her activities of daily living. Physical examination was normal, except for poor anterior range of motion and marked muscle weakness of the left shoulder, leading Dr. Weissfeld to suspect a neurological condition. Plaintiff chose a nonaggressive treatment option of home exercises, with the understanding that if significant improvement was not seen in the next four to six weeks, surgery or obtaining an EMG (electromyography) would be considered. Tr. at 115-16.

7

**Evidentiary Hearing**

Plaintiff, who was represented by counsel at the July 7, 2005 hearing, testified to the following. She was 38 years old, had a 12th grade education, was 5'4", weighed 250 pounds, and had worked at a few unskilled jobs for short durations. Six years prior to the hearing, she was diagnosed with rheumatoid arthritis in her hands and shoulders. One year prior to the hearing she sustained a tear to her left shoulder due to which she was unable to lift things with her left hand. The medications (Plaquenil and Prednisone) initially prescribed by Dr. Triggs for the rheumatoid arthritis helped for a few months, but then the pain returned and new medications were prescribed. Plaintiff was currently taking Celebrex and Arava for the arthritis, but her shoulders and hands were still bothering her. She also might need surgery for her torn shoulder. Tr. at 23-28.

Plaintiff lived with her husband and three children, ranging from 3 to 13 years old. She was unable to do "heavy" housework, sweep, mop, open jars, or lift heavy pots or pans. The most she could lift was a gallon of milk, using her right hand. She could walk for 15 to 20 minutes and then would have to rest due to hip and lower back pain, and after sitting for 30 minutes she would have to get up and stretch. Plaintiff had a driver's license but did not drive because when she had flare-ups in her hands she could not turn the ignition key or the steering wheel. During the day, Plaintiff would watch TV. She was using Prednisone and Darvoset for flare-ups, taking 20 mg of Prednisone about once a month for a week and then cutting the dosage over the next two weeks. The Prednisone would take about three to four days to work. Tr. at 28-32.

Plaintiff's pain in her fingers, arms, and shoulders was "very severe" during a flare-up, making it hard for her to close her hands, move around, or concentrate on things. On a scale of one to ten, her pain during a flare-up was eight, and otherwise a three or four. She was on a waiting list to see a rheumatologist and had an appointment for September 21. Recently, Plaintiff started having anemia and had had a blood transfusion the day before the hearing. Tr. at 34-37.

Following Plaintiff's testimony, the ALJ asked a VE, who had been present during Plaintiff's testimony, whether there were jobs that could be performed by an individual who was restricted due to back problems and arthritis in her hands to lifting 10 pounds frequently and 15 to 20 pounds occasionally; who would have to sit down after being on her feet for one-half hour and stand after sitting for one-half hour to 45 minutes; and who was of Plaintiff's age, education, and work background. The ALJ stated that such an individual could work as a sedentary cashier, an order clerk, or receptionist, and that each of those jobs existed in significant numbers in Missouri and nationally. The ALJ asked the VE whether these jobs would be precluded if the ALJ credited Plaintiff's testimony regarding flare-ups of her rheumatoid arthritis and their severity – without specifying their frequency – and the VE responded that he did not think that with such restrictions, Plaintiff could maintain a job. Tr. at 38-40.

**Post-hearing Evidence**

On July 12, 2005, Dr. Triggs, in response to interrogatories, stated that she had been treating Plaintiff since December 12, 2005, and was currently treating her for,

9

among other things, rheumatoid arthritis, anemia, and depression. Dr. Triggs stated that Plaintiff needed Prednisone for her arthritis three to four times a year. She opined that it would be consistent with the condition for which she was treating Plaintiff, for Plaintiff to have flare-ups of rheumatoid arthritis a few times a month lasting three to four days at a time, and in response to whether Plaintiff would be incapacitated during those times, stated, "Yes, absolutely!". Tr. at 123-24.

**ALJ's Decision of September 22, 2005**

The ALJ first determined that Plaintiff had never engaged in substantial gainful activity. He then held that Plaintiff had the following "severe" impairments: rheumatoid arthritis; left shoulder impingement with partial rotator cuff tear; and obesity. The ALJ determined that none of these impairments, individually or in combination, equaled a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ proceeded to assess Plaintiff's RFC, noting that Plaintiff's credibility regarding her symptoms had to be considered under the standard set forth in Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984). The ALJ found that Plaintiff's minimal work record suggested a poor motive to work and diminished the credibility of her claim that she was disabled. Tr. at 14-15.

The ALJ noted that Plaintiff's testimony about her limited daily activities was inconsistent with the activities she had listed on the application questionnaire and that this inconsistency further diminished her credibility. He further found that the activities listed on the questionnaire were inconsistent with a disabling medical condition. The

10

ALJ rejected Plaintiff's testimony of disabling orthopedic pain, in light of the "very sporadic" medical treatment reflected in the record for such a problem. He pointed to the lack of records of treatments such as ongoing physical therapy, pain management, epidural injections, or hospitalizations in the past two years.

The ALJ noted that accepting Dr. Triggs's interrogatory answers with respect to the frequency of Plaintiff's flare-ups, would lead to the conclusion that Plaintiff could not engage in competitive employment. The ALJ, however, found that Dr. Triggs's opinion was "wholly unsupported" by any physical examination or diagnostic findings, or by Plaintiff's sporadic medical treatment during the period in question. The ALJ added that Dr. Triggs's comments amounted to an opinion on the ultimate question of whether Plaintiff was disabled under the Social Security Act, which was a matter reserved to the Commissioner. The ALJ accordingly gave Dr. Triggs's opinion "little weight." Tr. at 17.

The ALJ concluded that Plaintiff had the RFC to lift up to 10 pounds frequently and 15 to 20 pounds occasionally, could stand no more than one-half hour at a time and sit no more than one-half hour to 45 minutes before needing to stand up. The ALJ recognized that as Plaintiff had no past work, the burden shifted to the ALJ to show that there were jobs in the national economy that Plaintiff could perform. The ALJ concluded that the VE's testimony provided substantial evidence that Plaintiff could perform the unskilled sedentary jobs of sedentary cashier, order clerk, and receptionist, and that such jobs existed in significant numbers on the state and national levels. Thus, the ALJ concluded that Plaintiff was not disabled under the Act. Tr. at 17-18.

**New Evidence before the Appeals Council**

On September 21, 2005, and October 19, 2005, Plaintiff was seen by rheumotologist, Stanley Hayes, M.D., upon referral by Dr. Triggs, and Plaintiff presented to the Appeals Council copies of Dr. Hayes's reports. Following his examination of Plaintiff on September 21, he wrote that Plaintiff "was functional for most self care and activities of daily living but it is variable." Dr. Hayes noted that Plaintiff's fingers, wrists, knees, and ankles had some swelling; that her elbows had full extension; that her right shoulder had full flexion (150 degrees); and that her left shoulder's flexion was limited to about 80 degrees. Dr. Hayes's impressions included "[r]heumatoid arthritis with active, persistent inflammatory disease," a history of left shoulder rotator cuff tear, depression, and obesity. For the rheumatoid arthritis, Dr. Hayes recommended continuing Arava in combination with a retrial of Methotrexate, with careful monitoring. Tr. at 226. At the visit on October 19, Plaintiff reported no adverse effects from her medication, but only minimal benefit. She complained of fatigue as her "single greatest concern." Dr. Hayes continued Plaintiff on her same medications, directing that she check certain levels in six weeks at home, and return to see him in 12 weeks. Tr. at 128. The Appeals Council summarily denied Plaintiff request for review.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The

13

Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying

ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments, such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE. Here the ALJ decided at step five that, based upon the VE's testimony, there were jobs in the economy that Plaintiff could perform.

**<u>Discounting Treating Physician's Opinion</u>**

Plaintiff argues that the ALJ erred in giving little weight to Dr. Triggs's opinion of July 12, 2005, that it would be consistent with the condition for which she was treating Plaintiff, for Plaintiff to have flare-ups of rheumatoid arthritis a few times a month lasting three to four days at a time, and that Plaintiff would be incapacitated during those times. As noted above, the ALJ found that Dr. Triggs's opinion was "wholly unsupported" by any physical examination or diagnostic findings, or by Plaintiff's sporadic medical treatment during the period in question. The ALJ added that Dr. Triggs's comments amounted to an opinion on the ultimate question of whether Plaintiff was disabled under the Social Security Act, which was a matter reserved to the Commissioner. The ALJ stated that he accordingly, gave Dr. Triggs's opinion "little weight." Tr. at 17.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The

15

ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2).

An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); see also Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003) ("Although the opinion of a treating physician is normally entitled to deference, an ALJ need not defer to such an opinion when it is not internally consistent or is not supported by acceptable clinical or diagnostic data."). In addition, a treating source's opinion that an individual is unable to work is not considered to be a medical opinion, but rather an opinion on a matter reserved for the Commissioner, and thus not entitled to controlling weight. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (citing Social Security Ruling 96-5p, which states that such an opinion, even when given by a treating source, "can never be entitled to controlling weight or given special significance").

Here, the ALJ did not discount Dr. Triggs's medical diagnosis of rheumatoid arthritis, but rather questioned her opinion as to the frequency and severity of flare-ups. Although the matter is not free from doubt, the Court concludes that the ALJ was entitled

to give Dr. Triggs's interrogatory answer little weight on those issues. First, Dr. Triggs did not affirmatively state that Plaintiff had incapacitating flare-ups once a month lasting three to four days each time, only that such frequency would not be inconsistent with Plaintiff's condition.

Second, as the ALJ noted, Plaintiff's treatment record during the relevant time (from May 1, 2004, to the date of the ALJ's decision) does not reflect an ongoing disabling impairment. On June 24, 2004, examining consultant, Dr. Demorlis reported normal range of motion values and found that Plaintiff's rheumatoid arthritis seemed to be quiescent. Dr. Triggs's progress notes dated July 28, 2004, state that Plaintiff was feeling good, and that her joints, other than her left shoulder, were much better, and on October 12, 2004, Plaintiff chose a nonaggressive form of treatment for her problems with her left shoulder. On October 19, 2005, Plaintiff's chief complaint to Dr. Hayes was fatigue. Moreover, the Court notes that Dr. Triggs is not a specialist, but rather was Plaintiff's family physician. In sum, the Court concludes that the ALJ did not commit reversible error in according Dr. Triggs's interrogatory answers only little weight.

**Assessment of Plaintiff's RFC**

Plaintiff also argues that the ALJ improperly assessed an RFC that was not based on any medical evidence. A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and

17

stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore, required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here the ALJ concluded that Plaintiff had the RFC to lift up to 10 pounds frequently and 15 to 20 pounds occasionally, could stand no more than one-half hour at a time, and could sit no more than one-half hour to 45 minutes before needing to stand up. The restrictions regarding sitting and standing reflect Plaintiff's own testimony on these activities. The ability to lift up to 20 pounds is consistent with Plaintiff's representations to Dr. Demorlis on June 24, 2004. Even if the record established that during a flare-up of her rheumatoid arthritis, Plaintiff would not be able to lift even 10 pounds, the record does not establish that flare-ups were of such frequency and duration as to render

Plaintiff unable to engage in substantial gainful activity. As noted above, Dr. Hayes reported on September 21, 2005, that Plaintiff "was functional for most self care and activities of daily living but it is variable." Tr. at 26.

The Court also notes, that neither Dr. Triggs nor any other treating or examining physician, including Dr. Hayes, imposed any exertional restrictions on Plaintiff and this lends support to the finding that Plaintiff was not disabled. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that lack of restrictions imposed by physicians supported ALJ's decision that the plaintiff was not disabled).

## **CONCLUSION**

Although there is evidence in this record that could support a different decision, upon review of the entire record, the Court concludes that the Commissioner's decision that Plaintiff was not disabled is based upon substantial evidence.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 18th day of January, 2007.